**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

EARL J. PARKER, JR.; GLENN C.
REDMON,
<u>Petitioners,</u>

v.

DIRECTOR, OFFICE OF WORKERS'

No. 94-2653

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
FARRELL LINES, INC.; ROYAL
INSURANCE COMPANY,
<u>Respondents.</u>

On Petition for Review of an Order of the Benefits Review Board.
(92-982-BLA, 92-983-BLA)

Argued: September 25, 1995

Decided: February 9, 1996

Before POWELL, Associate Justice (Retired),* United States
Supreme Court, sitting by designation, and MURNAGHAN and
WILLIAMS, Circuit Judges.

_____

Denied by published opinion. Judge Williams announced the judg-
ment of the court and wrote an opinion, in which Judge Murnaghan
joined as to Part IV. Judge Murnaghan wrote a concurring opinion.

_____

*Justice Powell heard oral arguments but did not participate in the
decision. The decision is filed by quorum of the panel. 28 U.S.C. § 46(d).

**COUNSEL**

**ARGUED:** John Harlow Klein, RUTTER & MONTAGNA, Norfolk, Virginia, for Petitioners. Joshua Thomas Gillelan, II, Senior Attorney, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C.; Gerard E. W. Voyer, TAYLOR & WALKER, P.C., Norfolk, Virginia, for Respondents. **ON BRIEF:** Thomas S. Williamson, Jr., Solicitor of Labor, Carol A. De Deo, Associate Solicitor, Office of the Solicitor, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Respondent Director. Donna White Kearney, TAYLOR & WALKER, P.C., Norfolk, Virginia, for Respondents Farrell Lines and Royal Insurance.

_____

**OPINION**

WILLIAMS, Circuit Judge:

As a quorum, we must decide whether a container-repair facility that neither is contiguous with navigable waters nor touches such waters, and that is not within the boundary of a shipping terminal, is a maritime situs under the Longshore and Harbor Workers' Compensation Act (the LHWCA), 33 U.S.C.A. §§ 901-950 (West 1986). Petitioners Earl J. Parker, Jr. and Glenn C. Redmon were injured in separate accidents during the course of their employment as, respectively, an inspector and a container mechanic for respondent Farrell Lines, Inc.**1** Petitioners challenge a decision of the Benefits Review Board (the Board) affirming the decision of an administrative law judge (ALJ) denying their claims for compensation on the basis that their injuries did not occur on a maritime situs. See 33 U.S.C.A. § 903(a) (West 1986). Because we conclude that the off-terminal facility where Petitioners were injured is not a maritime situs, as another panel has defined that term in Sidwell v. Express Container Services, Inc., No. 95-1101, ___ F.3d #6D 6D6D# (4th Cir. Dec. 28, 1995), we deny the petition for review. In addition, we take this opportunity

_____

**1** Royal Insurance Company, Farrell's insurer, is also named as a respondent in the petition for review. For ease of reference, we refer to both as "Farrell."

2

to clarify the role of the Director of the Office of Workers' Compensation Programs (the Director) in review proceedings under the LHWCA.

I.

Farrell owns ships that transport containerized cargo[2] to and from various ports, including the Norfolk International Terminal (NIT) in Norfolk, Virginia. Farrell also owns containers into which cargo is packed before shipping. Farrell periodically inspects its containers and makes necessary repairs as a part of its shipping operations.

Farrell leases a small inspection and repair facility at NIT, but performs most of its container-repair work at a larger facility located at 901 West 24th Street in Norfolk (the 24th Street site), approximately five miles from NIT. Although Farrell originally conducted all of its container-repair operations at NIT, expansion of the terminal compelled Farrell to transfer most of these operations off-terminal. Farrell employees engage in the same activities at the 24th Street site as at NIT. One Farrell employee is permanently assigned to the NIT facility; others are transferred to and from the NIT facility on an as-needed basis. In addition to servicing containers from NIT, the 24th Street site receives containers, chassis, and refrigeration units that arrive overland by truck and by rail.

The 24th Street site is located in an area of Norfolk zoned for light industrial uses and is surrounded by a residential area to the north, a railway to the south, and various small businesses in the immediate vicinity. Farrell selected the 24th Street site for a variety of reasons including proximity to NIT, the ease with which containers and employees could be moved between NIT and the 24th Street site, suitability of the site for container repair, and favorable lease terms. Farrell considered and rejected several other sites because of their greater distance from NIT and their unsuitability to Farrell's purposes.

_____

[2] The term "containerized cargo" refers to cargo that has been loaded into mobile storage units -- containers -- for the purpose of transporting the cargo to its destination.

3

Petitioners were injured in separate instances at the 24th Street facility[3] and received compensation under the Virginia Workers' Compensation Act. Each petitioner filed a separate claim under the LHWCA, seeking the greater benefits it affords. The administrative law judge (ALJ) consolidated the actions and denied benefits, basing the denial on his determination that the 24th Street site was not a maritime situs covered by the LHWCA. The Board affirmed, and Petitioners now seek review of the ALJ's decision. Whether a particular site is a maritime situs under the LHWCA is a mixed question of law and fact subject to plenary review. See Humphries v. Director, OWCP, 834 F.2d 372, 374 (4th Cir. 1987), cert. denied, 485 U.S. 1028 (1988).

II.

In order to qualify for benefits under the LHWCA, a claimant must establish that, at the time of the injury, he was engaged in maritime employment (the "status" test), see 33 U.S.C.A. §§ 902(3), 903(a) (West 1986), and that he was injured "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)," 33 U.S.C.A.§ 903(a) (the "situs" test). The status and situs tests were created as part of the 1972 amendments to the LHWCA, the purpose of which was to expand coverage to include workers who travelled from ship to shore as they worked, thereby preventing such workers from walking in and out of coverage during the course of the day. See Humphries, 834 F.2d at 373.

Petitioners contend that the ALJ erred in concluding that the 24th Street site is not a maritime situs under the LHWCA. According to Petitioners, the 24th Street site properly is considered an "other adjoining area" of NIT, at least in part because Farrell was forced by expansion of NIT to move its container-repair operations to the 24th

_____

[3] Because the parties have stipulated that Petitioners were engaged in maritime employment at the time of their injuries, see 33 U.S.C.A. §§ 902(3), 903(a) (West 1986), discussion of the circumstances surrounding Petitioners' injuries is unnecessary.

Street site, the closest available site to the terminal. Petitioners claim that extending the reach of the LHWCA to the 24th Street site, five miles from NIT, is necessary to avoid the sort of sporadic coverage that the 1972 amendments to the LHWCA were designed to eliminate.

Our analysis of the question of whether the 24 Street site is a maritime situs under the LHWCA is controlled by the recent decision of this court in Sidwell v. Express Container Services, Inc., ___ F.3d ___ (4th Cir. 1995). In Sidwell, we explicitly rejected tests based on interpretations of the phrase "other adjoining area" offered by the Third, Fifth, and Ninth Circuits on the ground that each test "openly disavow[ed] the statutory text." Id., slip op. at 9. Instead, based on the ordinary meaning of the term "adjoin," we held that "an area is `adjoining' navigable waters only if it `adjoins' navigable waters, that is, if it is `contiguous with' or otherwise `touches' such waters." Id., slip op. at 11-12. Additionally, we noted that the situs test may be satisfied if the injury occurs within the boundaries of a marine terminal that is contiguous with navigable waters. Id. , slip op. at 15 n.11.

Applying the principles of Sidwell to the facts before us, we conclude that Petitioners have not established that they were injured on a maritime situs. Under Sidwell's cogent explanation of the statutory language, the dispositive question of whether the 24th Street site is a maritime situs involves a straightforward geographical determination: either the 24th Street site adjoins navigable waters and is a maritime situs, or it does not and is not. Because the 24th Street site neither is contiguous with navigable waters, nor touches such waters, nor is located within the boundaries of NIT, it cannot be a maritime situs under the LHWCA. That Farrell was compelled to relocate to the 24th Street site by expansion of NIT does not affect our decision, nor does it matter that some Farrell employees occasionally travel between NIT and the 24th Street site. As we explained in Sidwell, the relevant inquiry is whether the situs upon which the injury occurred is a maritime situs:

> [Claimant] argues that whether terminal expansion has forced relocation from a site directly adjoining navigable waters to one that does not adjoin such waters (but is the closest feasible), is relevant to whether a particular site

5

adjoins navigable waters. We disagree. The exigency of even a forced relocation cannot transform a site distant from navigable waters into one that somehow "adjoins" those waters. The site either adjoins navigable waters or it does not, and, as the Supreme Court has instructed, that is a geographical inquiry.

The same must be said with respect to the fact that[the employer] had mobile trucks which went to the terminal to perform minor repairs on-site. That an employer sends some workers to the waterfront -- or even that an employer has a separate site altogether that is "adjoining" navigable waters -- is not germane to the question of whether an injury occurred at a covered situs. The statute is expressly limited to the place where the "injury occurr[ed]"; an employer's other activities or locations are irrelevant to the geographic inquiry of whether the injury occurred at a covered situs.

Id., slip op. at 12 n.8. Accordingly, we deny the petition for review.

III.

I cannot share Judge Murnaghan's view that Sidwell is wrongly decided because that decision employs too narrow a construction of the term "adjoining." In my view, Sidwell correctly rested on the plain language of the statute. See Reves v. Ernst & Young, 113 S. Ct. 1163, 1169 (1993) (noting that plain statutory language is conclusive in the absence of a clearly expressed legislative intent to the contrary). Judge Murnaghan's reliance on policy grounds to expand the situs test beyond that contemplated by the plain language of the statute is particularly inappropriate in light of the Supreme Court's clear admonition that we not substitute our own policy preferences for those of Congress. See Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 483-84 (1992). Moreover, the policy on which Judge Murnaghan relies -- that of favoring coverage over non-coverage, post at 18 -- proves too much: it is precisely the policy that Sea-Land Service, Inc. v. Director, OWCP, 540 F.2d 629, 636-38 (3d Cir. 1976), wielded to eliminate the situs requirement altogether, a result directly contrary to the statute and expressly disapproved by the Supreme Court in Herb's

6

Welding, Inc. v. Gray, 470 U.S. 414, 426-27 (1985); see also Humphries, 834 F.2d at 372 (disapproving of Third Circuit's reasoning in Sea-Land Service). As Sidwell explains, slip op. at 13-14, in enacting the 1972 amendments to the LHWCA Congress was motivated by the much more narrow policy of providing uniform coverage on both sides of the gangplank, the water and the adjoining land. Finally, I cannot agree with Judge Murnaghan that we owe deference to the Director's amorphous interpretation of the situs requirement. As Sidwell held, that interpretation -- under which locations as remote as Kansas City, Kansas would be covered situses -- conflicts with the plain statutory language and hence is due no deference. See id., slip op. at 15-16.

IV.

We take this opportunity to address the Director's proper role in petitions for review under the LHWCA. The LHWCA provides in pertinent part that "[a]ny person adversely affected or aggrieved by a final order of the Board may obtain review of that order in the United States court of appeals for the circuit in which the injury occurred." 33 U.S.C.A. § 921(c) (West 1986). While the Director was a party to all petitions for review prior to the 1972 amendments to the LHWCA, Congress did not designate the Director as a party to petitions for review in the 1972 amendments. See I.T.O. Corp. v. Benefits Review Bd., 542 F.2d 903, 906 (4th Cir. 1976) (en banc) (I.T.O. Corp. I), vacated and remanded on other grounds sub nom. Adkins v. I.T.O. Corp., 433 U.S. 904 (1977).[4] In I.T.O. Corp. I, we held that Congress' failure to designate the Director as a party meant that "if the Director is to be a party, [s]he must be a `person adversely affected or aggrieved by a final order of the Board' within the meaning of § 912(c)." Id. at 907. Based on this reasoning, we concluded that the Director is not a proper respondent in a petition for review under the

_____

**4** On remand, the en banc court adhered to its holding that the Director is not a proper respondent in a petition for review under the LHWCA. See I.T.O. Corp. v. Benefits Review Bd., 563 F.2d 646, 648 (4th Cir. 1977) (en banc) (per curiam) (I.T.O. Corp. II ).

7

LHWCA unless she can show that she is a person adversely affected or aggrieved by the decision of the Board.**5** Id. at 909.

The holding of I.T.O. Corp. I should have ended the practice of automatically naming the Director as a respondent in all petitions for review under the LHWCA. The practice did not end, however, perhaps because I.T.O. Corp. I did not discuss the impact of Federal Rule of Appellate Procedure 15(a), which requires that "the agency must be named respondent" in a petition for review of an order of an administrative agency, board, commission, or officer. We agree with the District of Columbia Circuit that Rule 15(a) simply is not applicable in the context of a petition for review under the LHWCA because the Director's presence as a party is not necessary:

> Normally, a single private party is contesting the action of an agency, which agency must appear and defend on the merits to insure the proper adversarial clash requisite to a "case or controversy." But Rule 1(b), Fed.R.App.P., says that "[t]hese rules shall not be construed to extend or limit the jurisdiction of the courts of appeals as established by law." Here, there is sufficient adversity between [the employer and the claimant] to insure proper litigation without participation by the Board. To require the Board to appear as a party would parallel requiring the District Court to appear and defend its decision upon direct appeal.

McCord v. Benefits Review Bd., 514 F.2d 198, 200 (D.C. Cir. 1975); see also Shahady v. Atlas Tile & Marble Co., 673 F.2d 479, 485 (D.C. Cir. 1982) ("The reasoning of McCord--that the rationale of Rule 15(a) is inapplicable to this kind of situation--applies as much to the [Director] as it does to the Board."). But see Ingalls Shipbldg. Div., Litton Sys., Inc. v. White, 681 F.2d 275, 283 (5th Cir. 1982) (declining

_____

**5** The Director is adversely affected or aggrieved if a decision by the Board directly hampers the Director's ability to carry out her statutory duties. See Director, OWCP v. Newport News Shipbldg. & Dry Dock Co., 8 F.3d 175, 180-81 (4th Cir. 1993), aff'd, 115 S. Ct. 1278 (1995). The Director's mere disagreement with the decision of the Board does not render her adversely affected or aggrieved. See I.T.O. Corp. I, 542 F.2d at 907-09.

8

to follow <u>Shahady</u>), <u>overruled in part on other grounds by Newpark Shipbldg. & Repair, Inc. v. Roundtree</u>, 723 F.2d 399 (5th Cir. 1984).

Therefore, we reaffirm the holding of <u>I.T.O. Corp. I</u> that the Director shall not automatically be named as a respondent in a petition for review under the LHWCA, but must make an affirmative showing that she is adversely affected or aggrieved by the decision of the Board.[6] If the Director is not adversely affected or aggrieved by the decision of the Board, but nonetheless wishes to participate on behalf of one of the parties, she first must request and be granted permission to intervene on the side of the party whose position she supports. <u>see</u> <u>I.T.O. Corp. I.</u>, 542 F.2d at 909 ("The Director unquestionably has a right to seek to intervene under Rule 24(b) Fed.R.Civ.P., and an application will ordinarily be granted.") (footnote omitted). In accordance with this holding, we dismiss the Director as a respondent in this petition for review and grant the Director's motion to intervene <u>nunc pro tunc</u> on the side of Petitioners.[7]

V.

Because the 24th Street site is not contiguous with navigable waters, we conclude that it is not a maritime situs under the LHWCA. Accordingly, we deny the petition for review.

<u>DENIED</u>

MURNAGHAN, Circuit Judge, concurring:

A panel of three Fourth Circuit judges (or of two acting as a <u>quorum</u>) may not overrule a prior published panel opinion. <u>Norfolk & Western Ry. v. Director, OWCP</u>, 5 F.3d 777, 779 (4th Cir. 1993) ("Even if we were so inclined, . . . a panel of this court may not overrule another panel's decision."). Though I do so with great reluctance, I must therefore regard as binding the opinion filed for publication in

_____

[6] In addition, we note that this holding applies only to petitions for review under the LHWCA.

[7] We have considered the Director's position with respect to the proper interpretation of the phrase "other adjoining area," and reject that position for the reasons stated in <u>Sidwell</u>. <u>See Sidwell</u>, slip op. at 18-20.

9

December 1995, in <u>Sidwell v. Director, OWCP and Express Container Services, Inc.</u>, No. 95-1101 (4th Cir. Dec. 28, 1995). I say "with great reluctance" because <u>Sidwell</u>, in addition to creating a circuit conflict with the Fifth Circuit's decision in <u>Texports Stevedore Co. v. Winchester</u>, 632 F.2d 504 (5th Cir. 1980), <u>cert. denied</u>, 452 U.S. 905 (1981), narrowly interprets the word "adjoining," as it appears in the phrase "other adjoining area" in the Longshore and Harbor Workers' Compensation Act (LHWCA), to mean only "adjacent" or "contiguous with."[1] <u>See</u> slip op. at 10. The Oxford English Dictionary, however, defines "adjoining" not solely as "adjacent," but also as "neighbouring." It further defines"neighbouring" as "lying or living near." The word "neighboring" is by no means so circumscribed or limiting as "adjacent" or "contiguous with." If it were, the frequently used phrase "next-door neighbor" would be unnecessarily repetitive. Not surprisingly, therefore, one judge who concurred in <u>Sidwell</u> objected to the majority's "more literal interpretation" of the statutory language.

As I endeavor to make clear in the paragraphs that follow, I believe that <u>Sidwell</u>'s interpretation of the LHWCA's phrase "other adjoining area" is entirely at odds with the meaning that Congress intended us to ascribe to it. I also am persuaded that, in the instant case, Petitioners' injuries were sustained at an "adjoining area," properly construed.

I.

Petitioners' employer, Farrell Lines, Inc., owns and operates ships that transport container cargo to and from numerous ports, including the Commonwealth of Virginia's Norfolk International Terminal (NIT). Until 1980, Farrell conducted all Norfolk-area repairs of its containers at a situs located at NIT. In that year, however, in order to make room for a parking lot, the Commonwealth terminated Farrell's lease of a portion of the NIT property. Farrell therefore was forced to relocate most of its repair operations to a five-bay garage located on 24th Street in Norfolk, approximately five miles from the terminal

_____

[1] In reaching that conclusion, the <u>Sidwell</u> majority relies upon introductory comments in a Senate committee report not appearing in the corresponding House report as proof of the full Congress's intent. <u>See infra</u> note 6.

10

and one mile from navigable water. Farrell selected that site because the building into which the company moved had formerly been used by another container-repair outfit and so was already in many ways suited to that task, because the location was convenient for rotating personnel between it and NIT, because available facilities closer to NIT were located in areas zoned to exclude such repair activity, and because the facility was available for a reasonable cost. The 24th Street site shares its neighborhood with other repair facilities, a shopping center, private residences, and a few professional offices. The change in location was in no way brought about by Petitioners.

While at least one container repairman is permanently stationed at NIT, repairmen from the 24th Street location are called to NIT-- usually on a daily basis--to deliver parts, to conduct repairs, and to make inspections. A single manager is responsible for repair activity at both sites and coordinates the routine transport of personnel between them.

Petitioners, Earl J. Parker, Jr., and Glenn C. Redmon, performed inspection and repair functions for Farrell Lines; both were injured while working at the 24th Street site.[2] Both men received state workers' compensation benefits, but sought the additional benefits available under the LHWCA. Respondents--Farrell Lines and its insurer, Royal Insurance Company--resisted. While agreeing that Petitioners were maritime employees carrying out maritime tasks within the meaning of the LHWCA, Respondents contended that the injuries had not occurred at a maritime situs, as defined and required by the Act.

In an order issued on December 30, 1991, the Administrative Law Judge denied Petitioners' claims for federal benefits, focusing solely on the jurisdictional situs issue. He relied heavily upon the Ninth Circuit's decision in Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137 (9th Cir. 1978), finding that three of the four factors considered by that court to determine whether an injury occurred at a LHWCA-covered maritime situs had not been met: he concluded that the 24th Street site was not particularly suitable for maritime uses, that adjoin-

_____

[2] Redmon fell and injured his left wrist and Parker cut his left leg with a saw.

11

ing properties were not primarily devoted to maritime uses, and that the site was not close to a waterway.**3**

Petitioners appealed. On October 26, 1994, the Benefits Review Board affirmed the ALJ's decision, finding that the record contained substantial evidence to support the ALJ's determination that the injuries had not occurred at a covered situs. The Board approved of the ALJ's reliance upon Brady-Hamilton, citing a Fourth Circuit opinion, Humphries v. Director, OWCP, 834 F.2d 372 (4th Cir. 1987), cert. denied, 485 U.S. 1028 (1988), in which we described Brady-Hamilton as taking a "more practical approach" to the situs issue than that taken by two other circuits, and noting the Fourth Circuit's affirmance (albeit in an unpublished opinion, Davis v. Doran Co. of California, 865 F.2d 1257 (4th Cir. 1989), aff'g 20 B.R.B.S. 121 (1987)) of a Board decision founded upon the Brady-Hamilton factors. Petitioners subsequently filed for review of the Board's decision.

On March 20, 1995, the Director of the Labor Department's Office of Workers' Compensation Programs (OWCP) filed a brief arguing in favor of reversal of the Board's decision. The Director made two contentions: first, that Brady-Hamilton does not provide an exhaustive list of factors to be considered when making situs determinations under the LHWCA,**4** and second, that the OWCP's long-standing interpretation of the situs requirement favors Petitioners' position and deserves deference by us.

Though a court must defer to the ALJ's factual findings so long as they are supported by substantial evidence, Newport News Shipbuilding & Dry Dock Co. v. Tann, 841 F.2d 540, 543 (4th Cir. 1988), the issue of maritime situs under the LHWCA, "while imbued with `factual' qualities, is essentially a mixed question of law and fact which we . . . can review for errors of law," Humphries, 834 F.2d at 374.

_____

**3** The ALJ did find, though, that the fourth Brady-Hamilton factor had been met: the site was as close to the waterway as was feasible.
**4** The Director argued that the ALJ and Board wrongly ignored the broad purposes underlying the 1972 Amendments to the LHWCA when they asked whether Petitioners or Respondents had a greater claim to a majority of the Brady-Hamilton factors, rather than look at the overall functional relationship between the NIT and 24th Street facilities.

12

II.

A.

The LHWCA provides death and disability benefits to individuals who meet the Act's definition of "employee." **5** Such benefits are to be paid, however, only "if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a).

Section 903(a)'s parenthetical language was added by Congress in 1972. Pub. L. No. 92-576, § 2(c), 86 Stat. 1251 (Oct. 27, 1972), reprinted in 1972 U.S.C.C.A.N. 1452, 1452-53. The Senate Committee on Labor and Public Welfare and the House Committee on Education and Labor identified several reasons for so amending the Act. See S. Rep. No. 92-1125, 92nd Cong., 2nd Sess. 12-13 (1972); H.R. Rep. No. 92-1141, 92nd Cong., 2nd Sess. (1972), reprinted in 1972 U.S.C.C.A.N. 4698, 4707-08.**6** First, prior coverage "stop[ped] at the

_____

**5** The Act defines an employee as"any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repair-man, shipbuilder, and ship-breaker . . . ." 33 U.S.C. § 902(3). Respondents stipulated that Petitioners were employees within the meaning of the Act.

**6** The House and Senate reports are identical in nearly all pertinent respects. Because only the House report was published in U.S. Code Congressional and Administrative News, all references are made to that publication.

The House and Senate reports are different, however, in one respect. The Senate report states, in its introductory comments, that the Amendments expand the Act's coverage to "injuries occurring in the contiguous dock area related to longshore and ship repair work." See S. Rep. No. 92-1125, at 2. The Sidwell majority seizes upon this statement as conclusive evidence of the full Congress's intent. See Sidwell, slip. op. at 9. The House report, however--though otherwise identical to the Senate report in its discussion of section 903(a)'s parenthetical language--contains no such statement. Moreover, there is no question that the Amendments extended coverage to "the contiguous dock area": the question is whether coverage was extended to non-contiguous areas as well.

13

water's edge"; injuries occurring on land were covered only by states' workers' compensation programs. Consequently, there existed "a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occur[red]."[7] 1972 U.S.C.C.A.N. at 4707. Second, states' workers' compensation laws often provided inadequate benefits. Id. Third, Congress recognized that, "with the advent of modern cargo-handling techniques, such as containerization," more of the long-shoreman's work is now performed on land than before. 1972 U.S.C.C.A.N. at 4707-08. In sum, Congress believed that the amount of compensation received by an injured employee"should not depend on the fortuitous circumstance of whether the injury occurred on land or over water." 1972 U.S.C.C.A.N. at 4708.

The Supreme Court has acknowledged Congress's desire to remedy the fact that many workers, during the course of the work day, passed in and out of LHWCA coverage prior to the 1972 Amendments. See, e.g., P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 75 (1979); see also Humphries, 834 F.2d at 373 (making the same observation). As remedial legislation, the Act, as amended, must be "`liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results.'" Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 268 (1977) (quoting Voris v. Eikel, 346 U.S. 328, 333 (1953)).

Farrell Lines's 24th Street facility is not, standing alone, necessarily an "adjoining pier, wharf, dry dock, terminal, building way, [or] marine railway." See 33 U.S.C. § 903(a). Yet if we were to bear in mind our duty to interpret the statute broadly and in keeping with Congress's remedial purposes, we would surely conclude that Farrell Lines's 24th Street facility is a maritime situs within the meaning of section 903(a)'s reference to "other adjoining area customarily used

_____

[7] The present case presents the analogous situation where one seeks and obtains employment at which he will clearly be entitled to LHWCA benefits in case of injury, only to lose his entitlement to those potentially important benefits when by no action on his part his employer is forced to move the situs where he frequently works to another location, albeit as close to navigable waters as is feasible.

by an employer in loading, unloading, repairing, dismantling, or building a vessel."

B.

In an opinion issued in 1987, we concluded, after reviewing the issue of situs under the LHWCA, that "[t]here is . . . no single convincing test for determining just where the geographical boundaries of coverage under the LHWCA lie" and that the inquiry requires a "difficult exercise in line drawing." Humphries, 834 F.2d at 373-74. Though twenty-three Fifth Circuit judges had "struggled bravely with the issue," we observed that a majority of that court was able to devise "little more than a litany of factors which are not conclusive in a situs determination." Id; see Texports Stevedore Co. v. Winchester, 632 F.2d 504 (5th Cir. 1980), cert. denied, 452 U.S. 905 (1981). We stated that, in Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137 (9th Cir. 1978), the Ninth Circuit had taken "what at first glance at least seems a more practical approach," Humphries, 834 F.2d at 374, by identifying four primary (yet non-exclusive) factors to be weighed:

> the particular suitability of the site for the maritime uses referred to in the statute; whether adjoining properties are devoted primarily to uses in maritime commerce; the proximity of the site to the waterway; and whether the site is as close to the waterway as is feasible given all of the circumstances in the case.

Brady-Hamilton, 568 F.2d at 141. We declined, however, formally to adopt the Brady-Hamilton approach or "to offer a touchstone for all future LHWCA jurisdictional questions." Humphries, 834 F.2d at 375. We simply stated that a situs "need not be used exclusively for maritime purposes or be within any specified distance of navigable waters or a `maritime' operation" for it to be within the LHWCA's scope. Id. at 373. We then held that the Board had properly ruled that the given employee's injuries, sustained when the employee was struck by a car while picking up food for employees working overtime, had not occurred at a covered situs: the accident occurred more than a mile from the terminal, it occurred on a public highway that did not connect any portions of the employer's operations, it hap-

15

pened after the employee had patronized a restaurant that was separated from water and the terminal by a residential neighborhood, at least one other restaurant was closer to the terminal, and the employee's location at the time of the injury "did not result from hazards uniquely inherent in the shipyard industry." Id. at 375 (quotation omitted). While acknowledging our duty to read the situs requirement broadly, we believed that to find coverage on such facts would be to come "perilously close to eliminating [the situs requirement] entirely." Id. at 375.

Even though in Humphries we did not adopt a particular test for making situs determinations, this and other circuits have suggested that what the statute requires when it states that the injury must have occurred on either navigable waters or an "adjoining area," see 33 U.S.C. § 903(a), is a strong functional relationship between such waters and the site of the injury. In Newport News Shipbuilding & Dry Dock Co. v. Graham, 573 F.2d 167, 169 (4th Cir. 1978), cert. denied, 439 U.S. 979 (1978), for example, we held that a parts-making facility and a foundry were covered situses because they were "integral parts of the shipyard," even though they were located 1,200 feet and 3,000 feet from the water's edge, respectively. See also Brady-Hamilton, 568 F.2d at 141 (stating that, to further Congress's remedial purposes, "the [statutory] phrase`adjoining area' should be read to describe a functional relationship that does not in all cases depend upon physical contiguity").

Employing an approach focusing less on contiguity and more on functional relationships, at least two of our sister circuits have found non-contiguous areas to be maritime situses under the Act. In Texports Stevedore, for example, the Fifth Circuit held that a gear room located "five blocks from the gate of the nearest dock" and half of a block from the edge of Port Authority property was a covered situs. 632 F.2d at 507, 513-16. In Brady-Hamilton, the Ninth Circuit held that a gear locker "located approximately 2,600 feet north of the edge of the Columbia River and 2,050 feet outside the entrance gate of the Port of Longview" was a covered situs. 568 F.2d at 139-41. Our interpretation of the Act in Sidwell runs directly contrary to such rulings; indeed, the Sidwell opinion, while describing the approach taken in Brady-Hamilton, does not discuss the fact that a non-contiguous area was deemed covered in that case.

16

As in Humphries, we should again refuse to adopt a rigid definition of the statutory phrase "other adjoining area"--particularly one requiring that an area be contiguous with or adjacent to navigable waters--and reiterate that a situs "need not be. . . within any specified distance of navigable waters or a `maritime' operation" for it to fall within the Act's scope. See Humphries, 834 F.2d at 373. We should also reassert that, while the factors articulated by the Ninth Circuit in Brady-Hamilton are useful guideposts for conducting the situs inquiry, they do not comprise an exhaustive list of relevant considerations.

C.

In light of the statutory language, the legislative policies animating that language, the interpretation of the Act articulated by the Director of the OWCP in a document issued in 1977, and the facts of the present case, we should conclude that the 24th Street facility at which Petitioners' injuries occurred is a covered maritime situs.

As I have already stated, the word "adjoining" encompasses not only a strict notion of contiguity, but also a more relaxed notion of two things being located within the general vicinity of each other. See Webster's Third New International Dictionary 27 (1981) (defining "adjoining" as "touching or bounding" or being "near in space"). Recognizing our duty to interpret the statute broadly so that Congress's remedial objectives may be achieved, see Northeast Marine Terminal, 432 U.S. at 268, we should hold that the phrase"other adjoining area" does not require that an area be contiguous with navigable waters for that area to be covered by the LHWCA. To hold otherwise not only violates our duty to accord the statute a broad interpretation, but also fundamentally conflicts with the approach we took in Humphries. In that case, we did not narrowly ask whether the site at which the claimant was injured was contiguous with navigable waters. Instead, we took a fact-intensive approach, asking not only what the distance was between the situs and the water, but also whether the injury occurred on a road connecting the employer's operations, whether the site of the injury was separated from the water by non-maritime neighborhoods, whether the employee could have carried out his assigned task at a location closer to the terminal, and whether the employee's location at the time of the injury was attributable to"hazards uniquely

17

inherent in the shipyard industry." 834 F.2d at 375 (quotation omitted).

Employing a similarly fact-intensive analysis here, we should find that the off-terminal facility at which Petitioners sustained their injuries is sufficiently proximate to navigable waters to enable Petitioners to make claims for federal benefits. The 24th Street facility is located one mile from such waters. Farrell Lines was forced by the Commonwealth of Virginia to move most of its container-repair operations to the off-terminal site due to terminal expansion. The 24th Street facility is as close to the terminal as possible: at the time the facility was chosen, all closer facilities were located in areas zoned to exclude such operations. On a daily basis, workers are shuttled between the terminal and the off-terminal facility under the direction of a single supervisor in accordance with the company's repair needs; the 24th Street site was in fact chosen, at least in part, because of the ease with which such routine shuttling of personnel could be conducted. Petitioners' location at the time of their injuries was surely the result of "hazards uniquely inherent in the shipyard industry": due to shipyard expansion, Petitioners had no choice but to carry out essential maritime work that had once been performed near the water's edge at the 24th Street facility instead. In short, a very strong functional relationship exists between the 24th Street facility and NIT. See Graham, 573 F.2d at 169; Brady-Hamilton, 568 F.2d at 141.

The policy considerations underlying the passage of the 1972 Amendments should further persuade us that the 24th Street facility is a covered situs. Congress made clear that it regarded state-provided benefits as inadequate. See 1972 U.S.C.C.A.N. at 4707. It also made clear that it was deeply troubled by the fact that many maritime workers frequently passed in and out of LHWCA coverage while carrying on their daily tasks, so that the amount of compensation they received depended on "the fortuitous circumstance" of where they happened to be working when the injury occurred. See 1972 U.S.C.C.A.N. at 4707-08. Coverage was therefore extended landward. By adopting a cramped interpretation of the phrase "other adjoining area" and thereby denying Petitioners' claims on jurisdictional grounds, we are subjecting Petitioners to a "harsh and incongruous result[ ]," see Northeast Marine Terminal, 432 U.S. at 268, that is of the precise nature that offended Congress's sensibilities and motivated it to

18

amend the Act: Petitioners are entitled only to state benefits, even though they would have been eligible for additional benefits under the LHWCA if their injuries had occurred during one of the frequent shifts at the terminal, rather than during a shift at the nearby off-terminal facility to which the Commonwealth's actions forced their employer to move.[8]

It should also be noted that the Director of the OWCP has offered an interpretation of the statute that weighs in Petitioners' favor and that merits some deference. In August 1977, the Director of OWCP issued a document titled "LHWCA Program Memorandum No. 58" in order to inform OWCP's district offices of the "OWCP's position on the amended coverage of the Act." Program Memorandum No. 58 states:

> In areas in which additional space immediately adjacent to the previously established boundaries of a waterfront pier or terminal is not available for the expansion required by modernization, . . . such facilities as "gear lockers" . . . may be located outside the fenced boundaries of a terminal. Such facilities are in practical fact integral parts of the maritime terminal . . . ; they should be regarded as extensions of the terminals to which they relate.

Prog. Mem. No. 58, at 11.[9] Because Farrell moved most of its maritime repair activities away from the terminal only upon the Commonwealth's demand, and because the NIT and 24th Street facilities operate as a single, functionally integrated unit, the Director's interpretation of the statutory language suggests that Petitioners were injured at a situs covered by the LHWCA.

_____

[8] The fact that, as Judge Williams points out ante at 6-7, these policies were "wielded [by the Third Circuit] to eliminate the situs requirement altogether" is hardly grounds for choosing wholly to ignore those policies when interpreting the Act. If courts were compelled to abandon every tool of statutory construction that had ever been abused, we would be left with few tools indeed.

[9] Unlike Judge Williams, I fail to perceive how the Director's language can reasonably be construed to extend coverage to "locations as remote as Kansas City, Kansas." See ante at 7.

"Because the Director [of the OWCP] administers and enforces the LHWCA, this court defers to his interpretation [of that Act] unless it is unreasonable or contrary to Congressional intent." Zapata Haynie Corp. v. Barnard, 933 F.2d 256, 258 (4th Cir. 1991); accord Weyher/Livsey Constructors, Inc. v. Prevetire, 27 F.3d 985, 987 (4th Cir. 1994); Newport News Shipbuilding & Dry Dock Co. v. Howard, 904 F.2d 206, 208-09 (4th Cir. 1990). Indeed, we have stated that we will defer not only to the Director's reasonable administrative and policy-making decisions, but to his reasonable constructions of the Act's jurisdictional requirements as well. Zapata Haynie, 933 F.2d at 258 n.5. Even if Program Memorandum No. 58 represents only an articulation of enforcement guidelines, rather than a formal declaration of the agency's position, it is "still entitled to some weight on judicial review." Martin v. Occupational Safety and Health Review Comm'n, 499 U.S. 144, 157 (1991). The Director's interpretation of the Act is a reasonable one, and is therefore entitled to at least some measure of deference.

Given the strong functional relationship existing between the NIT and 24th Street facilities, the remedial objectives spurring passage of the 1972 Amendments, our duty to interpret the Act broadly so that those objectives may be achieved, and the Director's long-standing reasonable interpretation of the amended Act, we should hold that Petitioners sustained their respective injuries at a covered maritime situs.

III.

I have rambled on at some length to explain why the Sidwell case which we must follow is on shaky ground. What I have set forth here will only have relevance, however, if Sidwell or the instant case is reheard en banc or if certiorari is granted in either case by the United States Supreme Court.

20